IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL DAVID SEWELL,

                        Petitioner,

        vs.

R. TRIMBLE, Warden, Pleasant Valley
State Prison,

                        Respondent.

No. 2:11-cv-01476-JKS

MEMORANDUM DECISION

Michael David Sewell, a state prisoner appearing *pro se*, filed a Petition for a Writ of

Habeas Corpus under 28 U.S.C. § 2254.  Sewell is in the custody of the California Department of

Corrections and Rehabilitation, incarcerated at the Pleasant Valley State Prison.  Respondent has

answered.  Sewell has not replied.[1]

## I.  BACKGROUND/PRIOR PROCEEDINGS

Sewell was convicted following a jury trial in the Sacramento County Superior Court of

one count each of making criminal threats (Cal. Penal Code § 422) and misdemeanor battery

(Cal. Penal Code § 242).  In October 2008 the trial court, after finding that Sewell had suffered

eight prior convictions (Cal. Penal Code §§ 667.5(b), 667(b)-(I), 117012) and had served two

prior prison terms (Cal. Penal Code § 667.5(a)), sentenced Sewell to an aggregate prison term of

thirty-one years to life.  The California Court of Appeal, Third Appellate District, affirmed in an

---

[1] At Docket No. 22, Sewell filed a copy of a document entitled "Posthaste Modification
of Sentencing Restitution Fine and/or Strike Restitution Fine Points & Authorities in Support
Thereof (With Declaration)."  The Document bears a Court Caption for the Superior Court State
of California, County of Sacramento, but bears the case file number of this Court.  Nothing in
that document is relevant to the Petition filed in this Court.

unpublished decision,[2] and the California Supreme Court denied review on September 1, 2010.

Sewell timely filed his Petition for relief in this Court on May 30, 2011.

The California Court of Appeal summarized the facts underlying Sewell's conviction:

> On the evening of June 18, 2008, [Sewell] was living with his sister Lisa B. and her three sons, 18-year-old J.J., 15-year-old D.D ., and three-year-old J.D. J.J.'s girlfriend, Cecilia V., was also at the residence that evening.
>
> [Sewell] was asleep on the living room floor and J.D. was playing a video game. Eventually, D.D. told J.D. that it was bedtime and started to put away the game. J.D. began crying and [Sewell] awoke. An argument about the game ensued between [Sewell] and D.D.
>
> [Sewell] pushed D.D. onto the large couch and started choking him with both hands. J.J. ran toward the couch and punched [Sewell] twice in the face to stop him from choking D.D. [Sewell] fell to the ground, letting go of D.D. When [Sewell] stood back up, D.D. grabbed him by the waist and pushed him toward a small sofa. J .J. pinned [Sewell] and D.D. on the sofa.
>
> During the fight, Cecilia V. woke Lisa B. up and advised her that the males were "tussling." The women ran downstairs and found J.J. holding D.D. and [Sewell] in a "bear hug" on the small couch. Lisa B. told J.J. to "let them up" and assured him, "I'm down here, shouldn't be a problem. Let him up." J.J. released D.D. and [Sewell].
>
> Lisa B. told [Sewell] to leave the house. Instead, he ran to the kitchen stating words to the effect, "I'm going to show you how we do this." He grabbed a knife from the knife block and ran toward J.J., repeating, "I'm going to show you how we do this." Seeing [Sewell] approaching J.J., Lisa B. tried to push [Sewell] away but he shoved her backward onto the couch.
>
> Before Lisa B. could stand back up, [Sewell] stabbed J.J. in the back. He fell against the television and onto the ground. J.J. exclaimed, "Mom, mom, he stabbed me," and Lisa B. saw blood "just gushing out." Lisa B. asked [Sewell] why he "did that," and he told her to "[s]hut up." Cecilia V. telephoned the police.
>
> After stabbing J.J., [Sewell] turned to go after D.D. D.D. picked up a glass and threw it at [Sewell]. The glass shattered on the kitchen floor near [Sewell's] feet. [Sewell] told D.D., "I'm going to kill your little ass next." Lisa B. told D.D. to run, and he fled out the front door. [Sewell] tried to chase D.D. but he slipped on the carpet.
>
> [Sewell] ran out the front door to chase D.D. with J.J. and Lisa B. following. J.J. heard [Sewell] yell at D.D., "I'm going to catch you, 'I'm going to catch you." D.D. responded, "You can't catch me, you're too fat, you're too slow." D.D. estimated that [Sewell] chased him for seven to 10 minutes and reentered the house

---

[2] *People v. Sewell*, No. C060587, 2010 WL 1767226 (Cal. Ct. App. May 4, 2010).

two or three times.  [Sewell] brought out a different, two-pronged knife from the house during the chase.  At one point, D.D. told [Sewell], "You're lucky my dad wasn't here."  [Sewell] responded, "I would have stabbed his ass too."  The children's father was serving in Iraq at the time of the incident.

Lisa B. saw [Sewell] go into the house on two occasions and noticed that a knife was in his hand each time he came back out.  She heard him threaten D.D. approximately three times, "I'm going to get you.  When I get you, when I catch you I'm going to hurt you."  [Sewell] had not caught D.D. by the time the police arrived.

[Sewell] previously told D.D. that he had stabbed someone in a fight over cigarettes.  Lisa B. warned D.D. daily not to talk back to [Sewell] because he might hit or hurt D.D. when she was not present.

D.D. was afraid of [Sewell] at the time of the incident.  He believed that [Sewell] was trying to stab him and would have done so if he had caught him.  J.J. also believed that [Sewell] would have stabbed D.D. if he had caught him.  [Sewell's] fingerprints were found on the knife used to stab J.J.

A neighbor witnessed part of the incident and generally corroborated the participants' descriptions of events.

The defense rested without presenting any evidence or testimony.  In summation, defense counsel theorized with respect to count three that [Sewell] had threatened only to "get" D.D., not to kill him.  Counsel argued that, if D.D. was armed with a knife, [Sewell] may have been chasing D.D. for his own protection.  On count four, counsel argued that the family members had exaggerated the story and that Lisa B. never was hit or battered or pushed down.[3]

## II.  GROUNDS RAISED/DEFENSES

Sewell has raised four grounds:  (1) failure of the trial court to instruct *sua sponte* on self-defense as a defense to making criminal threats;  (2) ineffective assistance of counsel in failing to request a self-defense instruction; (3) prejudicial error in permitting the prosecutor to "educate" a witness (witness tampering); and (4) improper characterization of prior (1983) felony convictions as serious felonies.  Respondent contends that Sewell's third ground is procedurally barred and that his fourth ground is unexhausted.  Respondent asserts no other affirmative defenses.[4]

---

[3] *Id.* at *1-2.

[4] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2012).

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must

_____

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

be "objectively unreasonable," not just "incorrect or erroneous."[9]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error

---

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15] State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[16] This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[17]

Sewell has not replied to Respondent's answer. 28 U.S.C. § 2248 provides:

The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true.

Under § 2248, where there is no denial of the Respondent's allegations in the answer, or the denial is merely formal and unsupported by an evidentiary basis, the court must accept

---

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[15] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

Respondent's allegations.[18]  Where a petitioner has not disputed a contention in the response and

it does not appear from the record before the court that the contention is erroneous, the court may

accept that contention.[19]

## IV.  DISCUSSION

Ground 1:  Failure to Instruct on Self-Defense

Sewell contends that, because there was substantial evidence that the alleged victim had

threatened Sewell, he was entitled to a *sua sponte* instruction on the theory that self-defense was

a defense to the charge of making criminal threats.

> [Sewell] contends the trial court erred prejudicially by failing to instruct the jury sua sponte on self-defense in relation to count three (criminal threats).  We are not persuaded.
>
> The jury was instructed pursuant to CALCRIM No. 3470 on self-defense as it related to the crimes of assault with a deadly weapon, simple assault, and battery. The instruction was not made applicable to the count of criminal threats.
>
> "In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises '"only if [1] it appears that [Sewell] is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense *and the defense is not inconsistent with the defendant's theory of the case.* "'  [Citations.]"  (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148, quoting *People v. Barton* (1995) 12 Cal.4th 186, 195, italics added.)
>
> In this case, defense counsel theorized: "Now, according to find [Sewell] guilty of count 3, you're going to have to believe that [D.D.] was telling the truth about the whole story.  And, once again, someone who has been recently convicted of a felony, someone whose testimony came across as less than believable on the stand, I submit to you that [*D.D.*] *was probably puffing the story and you shouldn't believe it* and that [Sewell] is not guilty of criminal threats.  Instead, like Lisa [B.] testified, [Sewell] said, 'I'm going to get you,' and she said that—she clarified that in cross-examination she heard him say, 'I'm going to get you,' when he was chasing him.  [¶]  And [D.D.] said, 'You can't get me.  I'm too fast.  You're too fat.  You're too slow,' and that was the exchange that had happened, not a threat to kill." (Italics added.)

---

[18] *See Carlson v. Landon*, 342 U.S. 524, 530 (1952).

[19] *Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

An instruction that [Sewell] threatened to kill D.D. but did so in self-defense is patently inconsistent with the defense theory that D.D. merely puffed the story and the jury should not believe it.  A defense instruction for self-defense posits that a threat *to* kill (or cause great bodily injury) actually occurred.  The defense theory was that it did not occur; rather, [Sewell] threatened to "get" D.D. but not to kill him or cause great bodily injury.

[Sewell] replies that "self-defense was not inconsistent with [his] theory that [D.D.] had not taken his threats seriously."  Regardless whether that is so, self-defense was patently inconsistent with the defense theory that the threat was something less than a threat to kill.  Moreover, it did not appear that [Sewell] was relying on the inconsistent defense.  Thus, the trial court had no sua sponte duty to extend the self-defense instruction to the count of criminal threats.  (*People v. Dominguez, supra,* 39 Cal.4th at p. 1148.)

We note that counts one and two were dismissed following jury deadlock. [Sewell's] claim that the jury had "found" him "not guilty of chasing after [D.D.] wielding a knife, presumably on the theory of self-defense, upon which the defense relied," has no merit.[20]

A criminal defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."[21]  In a collateral attack on a state conviction, the question is whether the instructional error "so infected the entire trial that the resulting conviction violates due process."[22]  No court has ever held that a court has a *duty* to instruct a jury *sua sponte* on a point of law that is patently inconsistent with the defense theory of the case.  Because the Supreme Court has never held that such a duty exists, Sewell is not entitled to relief under his first ground.[23]

---

[20] *Sewell*, 2010 WL 1767226 at *7.

[21] *Matthews v. United States*, 485 U.S. 58, 63 (1988).

[22]  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[23] *Musladin*, 549 U.S. at 77 (2006); *see Van Patten*, 552 U.S. at 126.

Count 2:  Ineffective Assistance of Counsel

Sewell contends that because his trial counsel did not request that the jury be instructed on self-defense as a defense to the criminal threats charge, Sewell was denied the effective assistance of counsel.  The California Court of Appeal rejected this argument:

> Perhaps anticipating our conclusion in part II, *ante,* [Sewell] contends his trial counsel's failure to request a self-defense instruction for the count of criminal threats constitutes ineffective assistance.  The contention has no merit, either.
> "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'  [Citation.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Avena* (1996) 13 Cal.4th 394, 418.)
> [Sewell] does not contend that his trial counsel was ineffective for having relied on the theory of defense set forth in part II, *ante.*  More specifically, [Sewell] does not claim counsel rendered deficient performance by contending that D.D. puffed his testimony and no criminal threat was uttered.  Because counsel's choice of theory is unchallenged, there is no room for a contention that his representation was objectively unreasonable in that he failed to request a jury instruction that was inconsistent with his theory.  (*People v. Avena, supra,* 13 Cal.4th at p. 418.) There was no ineffective assistance.[24]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Sewell must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[25]  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[26]  Sewell must show that defense counsel's representation was not within the range of competence

---

[24] *Sewell*, 2010 WL 1767226 at *8.

[25] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[26] *Id.*

demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[27]

Sewell bears the burden of proving that counsel's trial strategy was deficient.  "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[28]  "[He] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."[29]  "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy."[30]  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[31]

Here, counsel made a strategic decision to pursue a defense that was inconsistent with the self-defense instruction in connection with the criminal threats charge, not out of ignorance of the law.  While in hindsight that may have been an incorrect strategy, it does not necessarily constitute ineffective assistance of counsel.[32]  As the California Court of Appeal noted, Sewell

---

[27] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[28] *Strickland*, 466 U.S. at 689.

[29] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

[30] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[31] *Strickland*, 466 U.S. at 681.

[32] *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

does not challenge counsel's strategic choice; therefore, that issue is not properly before this Court.  Sewell is not entitled to relief under his second ground.

Count 3:  Witness Tampering

Sewell contends that the trial court erred in allowing the prosecutor to "educate" a witness as to the responses he expected to the questions propounded to the witness.  As recited by the California Court of Appeal, Sewell's contention is based upon the following:

> During motions in limine, the prosecutor asked to introduce evidence that (1) during the attack, [Sewell] repeatedly threatened, "Now I'm going to show you how it's done in the pen, and I'm going to kill you" or "This is how we do it in the pen," and (2) [Sewell] previously had told D.D. about his having stabbed somebody in the "pen."

> Defense counsel responded that the references to "the pen" were more prejudicial than probative under Evidence Code section 352.  The trial court ruled that the words "in the pen" were relevant but must be excluded as more prejudicial than probative.  The court further ruled that evidence that [Sewell] had previously stabbed someone during an argument was admissible, but that any reference to prison or "the pen" must be excluded.

> The following day, D.D. appeared in court accompanied by appointed counsel. D.D. was then in custody on an unrelated robbery adjudication.  The court admonished D.D. not to mention the fact that [Sewell] had spent time in prison. Regarding the current incident, the court told D.D. not to use the words "in the pen." Regarding the prior prison stabbing, the court admonished D.D. not to mention the incarceration.  D.D.'s counsel requested time to discuss the admonition with D.D., and the court agreed.

> Defense counsel then raised a new concern, which was that [Sewell] had told D.D. he had "shanked" someone in a fight over cigarettes.  The court remarked that it did not "see any problem over discussing that it was a knifing over cigarettes." However, the word "shank" is "very prison-specific," so the words "knife" or "stabbing" should be substituted.

> D.D.'s counsel spoke with him again and explained the court's ruling. Counsel then asked the court to admonish D.D. as well.  The court admonished D.D., and he said he understood the court's ruling and did not have any questions.

> Immediately before he testified, D.D. reiterated that he understood the admonishment and did not have any questions.

> D.D. testified that, after Lisa B. told J.J. to let D.D. and [Sewell] go, J.J. released the duo and "[i]t's quiet.  It got like quiet."  This exchange ensued:

> "Q [BY THE PROSECUTOR]:  What happens next?

> "A   Then he says–then he goes and gets a knife.

"Q   Okay.  Do you remember if he said anything to you?

"A   He said, 'Oh, okay.'

"Q   Did he say anything else?

"A   No."

"[¶] . . . [¶]

"Q   After [Sewell] has the knife, do you hear him say anything?

"A   Naugh-uh.

Prior to this testimony, other witnesses had established that, when [Sewell] ran to the kitchen, he repeatedly stated words to the effect, "I'm going to show you how we do this."

After briefly eliciting testimony from D.D. concerning [Sewell's] stabbing of J.J., the prosecutor asked to approach the court.  Following a sidebar conference, the trial court excused the jurors from the courtroom.

The following ensued:

"THE COURT:  All right. The jury's left the courtroom, the doors are closed. [¶]  [Counsel for D.D.], the People expressed a concern at sidebar that perhaps witness [*sic*] may have over interpreted my admonishment such that that any of the things said to him by his uncle, he's concerned about testifying to.  [¶]  My admonishment was very specific. It was any reference to incarceration.  Anything else is fair game.

"[COUNSEL FOR D.D.]:  That's my understanding as well.  I've talked to [D.D.].  And I told him that he's free to talk about anything except incarceration.  [¶] I believe we even discussed cigarettes, and the Court said it was all right.  If he had knowledge that [Sewell] had stabbed somebody regarding some cigarettes, that wasn't even out of line.  [¶]  It's just the word 'shank' and any reference to [Sewell's] prior incarceration.  And it's my understanding that [D.D.] understands that.

"THE COURT:  All right.  Well, I wanted to make sure because, uh, again, if that's what he remembers, that's what he remembers.  [¶]  Apparently the People had perhaps expected, after reviewing discovery that, uh, perhaps the witness didn't have [*sic*] a memory of his uncle saying some things to him during the time that this episode was taking place.  [¶]  If he indeed has that memory, he's free to testify about it with the specific admonition that I put into play.  [¶]  I'm not going to tell him what to say and I myself haven't reviewed the discovery.  But if you wanted to confer briefly with the People and with the defense and then with your client, and just make sure everybody's clear, I'm comfortable with that.  [¶]  I'm just not suggesting the witness is certainly not doing anything, if you will, wrong and I put that in quotes. There's no problem.  [¶]  But to the extent just making sure, since apparently there has been some unexpected responses, just making sure that the admonishment wasn't overly broad.

"[COUNSEL FOR D.D.]:  My suggestion, and I don't want to be out of line, but perhaps—

"THE COURT:  Please go ahead.

"[COUNSEL FOR D.D.]: —perhaps he could impeach this witness and say isn't it true that you said or do you remember saying—show him the police report, allow him to refresh his recollection, and do it the typical way.

"THE COURT: That certainly is a good suggestion.  I was, of course, not going to make it myself, but there certainly ways [*sic* ] to address any perceived inconsistency or issue with the testimony.  [¶]  I think that what I wanted to make sure was just that nothing about my add [*sic* ] admonishment had been interpreted as too broad, and that it wasn't me that was keeping this witness from testifying to those things.  [¶]  If you're confident that it's not, we'll just proceed as before.  [¶]  And [prosecutor, defense counsel], you both can use any typical courtroom techniques at their [*sic* ] disposal, and that's fine with me.  [¶]   Anybody have any different suggestions?

"[THE PROSECUTOR]:  I absolutely do.  I don't think that the issue of impeachment is actually on point, to be honest.  [¶]  The witness was admonished not to make reference to a specific part of the language that he has given in statements as hearing.  [¶]  And my worry is that he's understanding, well, it's such an important part of that statement that he's not saying any of the statement because—

"THE COURT:  Well, [counsel for D.D.] is saying he doesn't feel that's the case based on his conversation with his client.

"[COUNSEL FOR D.D.]:  I can ask him with the Court's permission.

"THE COURT:  Why don't you have a private conference about that in a minute, and we'll make sure everybody's on the same page.

"[COUNSEL FOR D.D.]:  Okay just real briefly.

"[¶] . . . [¶]

"THE COURT:  [Counsel for D.D.], have you had a chance to talk with your client?

"[COUNSEL FOR D.D.]:  Yes, your Honor.

"THE COURT:  Okay.  Anything else you want to add?  Or again, what I am trying to do is make sure that I wasn't overly stifling.

"[COUNSEL FOR D.D.]:  I don't think so.  I think it's just been a lapse in memory.  And I—

"THE COURT:  And if that occurs, then ordinary course is certainly tried and true techniques exist, and I will let these people proceed."

When the jury returned, the prosecutor resumed his examination from where he had left off and never returned to the incident with the knife in the kitchen.  D.D. testified that after J.J. was stabbed, D.D. threw a glass on the floor.  D.D. told [Sewell] to leave J.J. alone.  [Sewell] said, "I'm going to kill your little ass next" and started chasing D.D.  D.D. testified that [Sewell] had told him a story about him having stabbed someone over some cigarettes.  D.D. testified that he believed the story, "since he stabbed my brother, yeah."  D.D. further testified that he had been afraid of [Sewell] "throwing the knife" and D.D. "getting stabbed" at the time [Sewell] was chasing him.

13

On cross-examination, defense counsel elicited D.D.'s testimony that [Sewell] had said, "Okay, okay, I'm going to show you how we do this." The statement was cumulative of the testimony of other family members.

[Sewell] contends the prosecutor's approach to the bench "set in motion the process of educating his witness as to the responses [the prosecutor] expected from him." He reasons that the trial court, by allowing the extended line of questions in the presence of D.D., violated its duty under section 1044 to "assure defendant a fair trial in the process of controlling trial proceedings."

[Sewell] did not raise any objection to the court's procedure at trial. Any concerns about D.D.'s presence in the courtroom could have been addressed had a timely objection been made. Contrary to [Sewell's] contention, the lengthy discussion presented ample opportunity for defense counsel to have entered a timely objection. Accordingly, [Sewell] has forfeited any claim of judicial misconduct. (*People v. Harris* (2005) 37 Cal.4th 310, 350; *People v. Samuels* (2005) 36 Cal.4th 96, 114.)[33]

Respondent contends that Sewell is procedurally barred from bringing this claim. This Court agrees.

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."[34] This Court may not reach the merits of procedurally defaulted claims, that is, claims "in which the petitioner failed to follow applicable state procedural rules in raising the claims . . . ."[35] "The state-law claim may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."[36] Procedural default does not preclude federal habeas review unless the last state court rendering

---

[33] *Sewell*, 2010 WL 1767226 at *3-5.

[34] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

[35] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

[36] *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).

judgment in a case, clearly and expressly states that its judgment rests on a state procedural bar.[37]
"[I]n order to constitute adequate and independent grounds sufficient to support a finding of
procedural default, a state rule must be clear, consistently applied, and well established at the
time of the petitioner's purported default."[38]   A discretionary state procedural rule can be firmly
established and regularly followed, so as to bar federal habeas review, even if the appropriate
exercise of discretion may permit consideration of a federal claim in some cases but not others.[39]

    Although the ultimate burden of proving adequacy of a state procedural bar is on the
Respondent, once Respondent has "adequately pled the existence of an independent and adequate
state procedural ground as an affirmative defense, the burden to place that defense in issue shifts
to the petitioner."[40]   Sewell may satisfy his burden "by asserting specific factual allegations that
demonstrate the inadequacy of the state procedure, including citation to authority demonstrating
inconsistent application of the rule."[41]   Here, because Sewell has declined to reply, Sewell has
failed to meet the burden imposed upon him to place Respondent's properly pled procedural bar
defense at issue.   Sewell is not entitled to relief under his third ground.

---

[37] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[38] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

[39]  *Martin*, 131 S. Ct. at 1128; *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009).

[40] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[41] *Id.*

Ground 4:  Improper Classification of Prior Felony Convictions

Sewell contends that the trial court incorrectly determined that his 1983 burglary

convictions were classified as serious felonies, i.e., first-degree burglaries instead of second-

degree.[42]  The California Court of Appeal rejected Sewell's argument:

> [Sewell] contends the trial court denied his *Romero* motion under a mistaken
> belief that his prior record was more egregious than it actually was.  Specifically, he
> argues the court mistakenly believed that his 1983 burglary convictions had been
> burglary in the first rather than the second degree. He claims he is entitled to a new
> *Romero* hearing where the court could consider his less egregious prior record.  The
> point has no merit.
>
> "On review, we examine the record in the light most favorable to the
> judgment to ascertain whether it is supported by substantial evidence.  In other
> words, we determine whether a rational trier of fact could have found that the
> prosecution sustained its burden of proving the elements of the sentence
> enhancement beyond a reasonable doubt. [Citations.]"  (*People v. Delgado* (2008)
> 43 Cal.4th 1059, 1067.)
>
> "Every burglary of an inhabited dwelling house . . . is burglary of the first
> degree." (§ 460, subd. (a).)
>
> The amended complaint filed June 10, 1983, alleged in count one that, on
> May 5, 1983, [Sewell] "did willfully, unlawfully, and feloniously enter an occupied
> residence . . ., in the nighttime, with the intent to commit larceny." The complaint
> alleged in count five that, on May 30, 1983, [Sewell] "did willfully, unlawfully, and
> feloniously enter an occupied residence . . ., in the nighttime, with the intent to
> commit larceny."
>
> The record contains both an "ORDER OF PROBATION Formal" and a
> "REPORT-INDETERMINATE SENTENCE, OTHER SENTENCE CHOICE" for
> proceedings on August 19, 1983.  A discrepancy between the forms gives rise to
> [Sewell's] claim of evidentiary insufficiency.
>
> The order of probation recites that on August 19, 1983, [Sewell] "entered his
> plea of Guilty to the charge of violation of Section 459 of the Penal Code, as charged
> in Counts One and Five of the Complaint."  Because the pleas were entered "as
> charged," the trial court could deduce that they had not been reduced to lesser charges

---

[42] Respondent contends that this claim is unexhausted.  Respondent does not support this
bare conclusory statement with any argument or other explanation.  On the other hand, although
it does not appear that it was presented on federal grounds, as discussed below it was fairly
presented to and considered by the California Court of Appeal on the basis of insufficiency of the
evidence.  Consequently, the Court declines to deny relief on the basis of a failure to exhaust
state-court remedies.

at the time of the plea.  The court could further deduce that the convictions were for burglary of two inhabited dwellings, which are serious felonies under sections 460, subdivision (a), and 1192.7, subdivision (c)(18).

The probation order and the report of other sentence choice both reflect that imposition of judgment and sentence was suspended and [Sewell] was placed on probation on conditions including a period of incarceration.  However, unlike the probation order, the report describes each count as "Burglary, 2nd."

In August 1984, [Sewell] admitted an allegation that he violated his probation.  At sentencing in September 1984, [Sewell] was "denied probation" and "committed to the State Prison . . . for the violation of section 459 of the Penal Code, *first degree,* as charged in Count One for the low term of two (2) years."  It was further ordered that "[Sewell] be committed to the State Prison . . . for violation of section 459 of the Penal Code, *first degree,* as charged in Count Five, for the low term of two (2) years.  Eight (8) months is stayed upon the completion of sixteen (16) months, which is one-third of the mid term." (Italics added.)

The sentences specified on this order are consistent with convictions of first degree burglary, which is punishable by imprisonment for two, four, or six years. (§ 461, subd. (a).)   Conversely, second degree burglary is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, or two or three years. (§§ 18, 461, subd. (b).)

The abstract of judgment for the 1984 proceeding lists both offenses as "Burglary, 1st."

At sentencing in the present case, the trial court stated: "I do accept the People's explanation . . . .   [I]t does appear that the first original abstract [1983 report], which does not even include a sentence such that I could see, is an incomplete abstract that perhaps was even prepared in error or at least contains some typos.  Every other indication, as the People have documented in their papers, as well as expressed orally, is of a conviction of first-degree burglary.  It was clearly a dwelling [*sic* ], and the sentence also reflects a sentence for first degree burglary. Frankly, I don't know how you get to that sentence even by a plea negotiation, so I do find that those are first degree burglaries . . . ."

Because the 1983 report reflected a grant of probation, the trial court's conclusion that the report was "incomplete" for having failed to "include a sentence" finds no support in the record.  However, the foregoing evidence adequately supports the trial court's deduction that the notations of "Burglary, 2nd Degree" were erroneous.  (*People v. Delgado, supra,* 43 Cal.4th at p. 1067.)  [Sewell's] reliance on *People v. Rodriguez* (1998) 17 Cal.4th 253, in which the People offered only an abstract of judgment that proved only the least adjudicated elements of the offense, even though proof of further facts was required, is misplaced.  (*Id.* at p. 262.)

[Sewell] claims the trial court was not entitled to consider the 1984 abstract in determining the degree of the burglary convictions.  Citing *People v. Guerrero* (1988) 44 Cal.3d 343, 355, and *People v. Lewis* (1996) 44 Cal.App.4th 845, 851, [Sewell] claims "[d]ocuments prepared after conviction and sentencing are not part

of the 'record of conviction' and hence cannot be used as proof that the prior conviction was for a serious felony."

However, as *Lewis* notes, "a trier of fact is entitled to 'consider the *entire* record of the [criminal] proceedings *leading to imposition of judgment on the prior conviction . . . .*' [Citation.]" (*Lewis, supra,* 44 Cal.App.4th at p. 851.) In this case, "imposition of judgment on the prior conviction" occurred in 1984, having previously been suspended in 1983. (*Ibid.*) Thus, the 1984 abstract of judgment is part of the "record of the [criminal] proceedings" that led to the imposition of judgment and sentence that year. *Lewis* allows, and does not preclude, consideration of the 1984 abstract of judgment. (*Lewis,* at p. 851.)

Because there was sufficient evidence that [Sewell's] 1983 burglaries were serious felonies, the trial court's ruling on [Sewell's] *Romero* motion need not be set aside. The court was entitled to consider the fact that [Sewell] had committed serious felonies on two prior occasions, i.e., in 1983 and 1987, rather than on just one occasion. There was no error.[43]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[44] This Court must, therefore, determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.[45] Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[46] This Court must also be ever mindful of the

---

[43] *Sewell*, 2010 WL 1767226 at *8-10.

[44] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

[45] *Jackson*, 443 U.S. at 318-19.

[46] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.[47]

This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Where, as in this case, the question is one of credibility, the finding of the finder-of-fact carries the day.[48]  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the fact finder, sufficient to sustain conviction.[49] Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[50]  Sewell bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous;[51] a burden Sewell has failed to carry.

The Sacramento County Superior Court's determination that the 1983 burglary conviction was a serious felony is amply supported by sufficient evidence under the *Jackson* rule.  Sewell is not entitled to relief under his fourth ground.

## V.  CONCLUSION AND ORDER

Sewell is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

---

[47] *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

[48] *See Bruce v Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

[49] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[50] *See Jackson*, 443 U.S. at 326.

[51] 28 U.S.C. § 2254(e)(1).

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[52]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[53]

The Clerk of the Court is to enter judgment accordingly.

Dated:  September 24, 2012.

_____
/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[52] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 325, 327 (2003))).

[53] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.